NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

BONNIE LIEDMAN KOCHALKA, )
)
       Appellant, )
)
v. )     Case Nos. 2D13-75
)                2D13-4304
LYNDSE BOURGEOIS, )
)     CONSOLIDATED
       Appellee. )
_____)

Opinion filed April 22, 2015.

Appeals from the Circuit Court for
Hillsborough County; Christopher C.
Sabella, Judge.

Mark D. Tinker and Charles W. Hall
of Banker Lopez Gassler, P.A., St.
Petersburg, for Appellant.

Louis K, Rosenbloum of Louis K.
Rosenbloum, P.A., Pensacola, and
Samuel S. Mehring, Jr., Tampa, for
Appellee.


KELLY, Judge.


       In these consolidated appeals, Appellant Bonnie Kochalka challenges the

final judgment entered in favor of Appellee Lyndse Bourgeois in an automobile

negligence action and the prevailing party cost judgment entered against her in the

same case. Ms. Bourgeois sued Ms. Kochalka for injuries she claimed to have sustained when Ms. Kochalka rear-ended her car while it was stopped at an ice cream shop's drive-through window. In the appeal from the final judgment, Ms. Kochalka asserts that the trial court erred in refusing to excuse a prospective juror for cause; that it improperly excluded opinion testimony of her only expert witness; and that Ms. Bourgeois improperly informed the jury about Ms. Kochalka's liability insurance. As explained below, we agree that the trial court erred in refusing to exclude a potential juror for cause and reverse on that basis. For the benefit of the parties on remand, we will also briefly address Ms. Kochalka's other contentions. As to the appeal of the cost judgment, the parties have stipulated that if the final judgment is reversed the cost judgment must also be reversed.

## Failure to Excuse a Prospective Juror for Cause

During jury selection, Ms. Kochalka's counsel asked the prospective jury panel if anyone had any life experiences that they thought they could not put aside when considering this case. He offered the prospective jurors an analogy in which he stated that if someone feared snakes, it would be very difficult for them to put that fear aside and be forced to pick up two snakes. Prospective juror Bonfe immediately raised her hand and discussed a prior bad experience she had with the judicial system, stating:

> MS. BONFE: I'm not sure if I can because the person that struck my mother never got a ticket and so we had to have a lawsuit and it was just—we just dropped it out of sake of sanity because we just—there was too many things on my mother's behalf, and I don't know having somebody driving— I think it would be very difficult.

> MR. WOOD: Okay. So what you're saying to us in fairness is that because this is an automobile accident, because of your experience, that this is kind of a snake—using my

- 2 -

analogy, it's not a tattoo but it's a snake kind of situation for you? Is that fair to say?

MS. BONFE: Uh-huh.

MR. WOOD: You couldn't really put that aside? Yes?

MS. BONFE: I would try very hard, but it would be very difficult, yes.

MR. WOOD: Okay. Another way to kind of say it, you see above the Judge you see—everybody see on that seal, it's called the blind lady of justice. Can you see it good enough to see that she's actually holding the scales of justice and she's blindfolded?

And so the idea is that anyone that comes into the courthouse in the State of Florida, those scales should be exactly equal before we start the case. They shouldn't be tipped one way or the other. If they are tipped one way or the other we want to know about it. And you don't know any of the facts of this case, but because it's an automobile accident do you kind of feel like those scales are already tipped a little bit?

MS. BONFE: Yeah, because my mother never got a fair opportunity and so it's very difficult.

Counsel then moved on to discussions with other prospective jurors, and eventually asked: "Is there anybody who hasn't already told us some things who feels like one side or the other starts out ahead because of your life experiences?" Prospective juror Blake raised her hand, leading counsel to state: "Yes, ma'am. Ms. Blake. Somebody does. You don't need to tell us who [you would favor]." He then asked her to explain that life experience, and she described how she no longer believes in the jury system at all, stating:

MS. BLAKE: Yeah. It doesn't have to do with this case, not this case, but this type of case. But recently, about two years ago, I went to a trial with my brother and I think the jurors didn't—we all believed in the jury system. He went to

- 3 -

trial and he was convicted and he's doing 25 years. And now I don't believe in the jury system.

MR. WOOD: That's very emotional.

MS. BLAKE: It failed him. It failed the family.

Counsel then noted that Ms. Blake had appeared to be crying when Ms. Bonfe previously discussed her own disdain for the judicial system, and Ms. Blake agreed, stating:

> MR. WOOD: Now, I may have perceived it wrong, but it seemed to me also that when Ms. Bonfe talked about what happened to her mother you seemed to well up or eye up a little bit at that point. Did I perceive that correctly or incorrectly?
>
> MS. BLAKE: Yeah. I—we thought that the jury system would be more lenient and more considerate, but after what we experienced--
>
> MR. WOOD: Okay.
>
> MS. BLAKE: --we don't—he was innocent.
>
> MR. WOOD: I understand that was a criminal case. This is not criminal. This is a civil.
>
> MS. BLAKE: I know but somewhere--because some of these people are going to be picked on this jury and the people--the Defendant probably is going to be thinking that they are going to be there for them and be understanding, but it didn't happen for him.
>
> MR. WOOD: Okay. Are you saying that you feel like you would have a hard time judging a case because of that experience?
>
> MS. BLAKE: I think so because we didn't—after that we didn't have any faith in the jury system.

At the conclusion of voir dire, the trial judge granted Ms. Bourgeois' cause challenge to Ms. Bonfe, but when Ms. Kochalka made the same request as to Ms.

Blake, the judge denied it. The parties then moved on to their peremptory challenges, and Ms. Kochalka's counsel used his first one on Ms. Blake. He then used up his remaining challenges, asked for an extra one due to the denial of his cause challenge, and identified Ms. Jones as someone he would like to strike due to the fact that her son was presently involved in a lawsuit and PIP claim arising out of an auto accident. The judge denied that request, and Ms. Jones was seated as a juror. As a result, Ms. Kochalka's counsel objected to the jury as empaneled.

The test for juror competency includes not only the question of whether the juror can lay aside any bias or prejudice toward the parties but also whether the juror can render a verdict based solely on the evidence presented and the instructions on the law given by the court. Thomas v. State, 958 So. 2d 1047, 1049 (Fla. 2d DCA 2007) (citing Busby v. State, 894 So. 2d 88, 95 (Fla. 2004)). When assessing that issue, "the trial court must excuse a prospective juror for cause if any reasonable doubt exists regarding his or her ability to render an impartial verdict. Id. at 1050. "In close cases, any doubt as to a juror's competency should be resolved in favor of excusing the juror rather than leaving a doubt as to his or her impartiality." Id.; see also Williams v. State, 638 So. 2d 976, 978 (Fla. 4th DCA 1994) ("Because impartiality of the finders of fact is an absolute prerequisite to our system of justice, we have adhered to the proposition that close cases involving challenges to the impartiality of potential jurors should be resolved in favor of excusing the juror rather than leaving doubt as to impartiality.").

Ms. Kochalka argues, and we agree, that prospective juror Blake failed both elements of that test, and she accordingly should have been excused. Ms. Blake

immediately raised her hand when counsel asked: "Is there anybody who hasn't already told us some things who feels like one side or the other starts out ahead because of your life experiences?" While she never identified which side she would favor, because counsel also told her "[y]ou don't need to tell us who," the fact that she responded as she did to counsel's question was an acknowledgement that in her mind one side was already ahead. Her acknowledgment of bias in favor of one party—regardless of which party it was—should have disqualified her from serving on the jury. See Four Wood Consulting, LLC v. Fyne, 981 So. 2d 2, 5 (Fla. 4th DCA 2007) (explaining that although prospective juror's remark stating she might be biased was not party-specific, her mere implication of bias should have led to dismissal).

Ms. Blake's additional remarks that she had no faith in the jury system likewise should have led to her disqualification. See Levy v. Hawk's Cay, Inc., 543 So. 2d 1299, 1300 (Fla. 3d DCA 1989) (reversing for a new trial where the trial court refused to strike potential jurors who "indicated that they had negative attitudes toward the legal system due to previous unfavorable experiences with lawsuits filed against themselves or members of their families"). Her remarks in this case raised a reasonable doubt "as to whether [she] possesse[d] the state of mind necessary to render an impartial verdict based solely on the evidence submitted and the law announced at trial." See id. Thus, the trial court erred when it did not resolve that doubt by striking Ms. Blake for cause.

Errors in jury selection are "per se errors." Thomas, 958 So. 2d at 1050. They are not subject to any harmful error analysis and instead require a new trial whenever there is a showing that an error occurred. Id.; see also Farina v. State, 680

So. 2d 392, 398 (Fla. 1996).  Accordingly, we reverse the final judgment and remand for a new trial.

Because this case is being remanded for a new trial, we will briefly address the remaining issues Ms. Kochalka raises as they likely will arise again.

### Exclusion of Ms. Kochalka's Expert's Opinion

One of Ms. Bourgeois' claimed injuries was a torn meniscus in her knee. She claimed that it happened when she struck her kneecap on the dashboard during the accident.  Ms. Kochalka had an orthopedic surgeon who was prepared to testify that from an orthopedic standpoint that was not possible.  In order for the meniscus to tear, there had to be a rotational or twisting injury, not a blunt force one.  The doctor explained:

> Q:  Doctor, in your education and training and experience have you treated knee injuries?
>
> A:  Yes.
>
> Q:  Have you treated knee injuries involved in sports activity?
>
> A:  Yes, I have.
>
> Q:  Have you treated meniscal injuries involved in blunt trauma?
>
> A:  Yes.
>
> Q:  Have you been educated and trained as far as how blunt trauma to the knee can cause cartilage damage?
>
> A:  Yes.
>
> Q:  Have you been educated and trained in your medical field, in medical school and medical training, as to how blunt trauma to the front of the knee can cause damage to the knee itself?

A: Yes.

Q: In your experience, education and training have you had patients who have received dashboard injuries to their knee?

A: Yes.

Q: Have you treated those conditions?

A: Yes.

Q: Have you diagnosed injuries to the knee as a result of a dashboard impact to the knee?

A: Yes.

Q: Doctor, I'd like you to assume for the purposes of my question that this individual, the Plaintiff, Ms. Bourgeois, did, in fact, have a dashboard impact of her knee. Assume that to be true, it hit the dash to the front part of the knee.

A: Yes.

Q: Do you have an opinion as to whether that type of impact based on your education, training and experience, not on any biomechanical training, but medical training, as to whether that would cause an injury to the medial meniscus?

A: Yes, I have an opinion.

Q: Would you give that opinion, please.

A: My opinion is that that is an unlikely mechanism of injury to tear a meniscus or a cartilage.

Q: Now, is that biomechanical or medical testimony?

A: It's basically orthopedic and related to where the impact occurs. It's not biomechanical. It's just sort of where—the way the injury occurs and the body part that's contacted.

. . . .

You may injure your kneecap joint or the kneecap, which is typically what dashboard injuries have been thought to

cause, but you're not going to be at a significant likelihood of tearing your meniscus because there is really no forces imparted to the meniscus in that scenario. It's off the kneecap, the thigh bone, and not to the tibia, not to the joint itself, other than the kneecap joint.

Q: In your experience, education and training, how are medial meniscus injured?

A: When meniscus tears are the result of trauma, all right, when they're the result of a traumatic event they are usually—it's usually a mechanism of injury that's typically weight bearing. So the meniscus is caught, pinched or squeezed between the femur and the tibia, and then typically with the meniscus caught between those two bones typically a twisting or a turning moment or a pivoting moment can do it, but also any other significant trauma which basically acts to either twist or turn or to forcibly force the leg in one position or another would apply—they would apply forces to the meniscus and tear it, but it's got to be a force that interacts—that affects that contact between the tibia and the femur because that's where the meniscus sits, in between those two bones.

Ms. Bourgeois successfully kept that testimony from the jury's consideration by arguing that it was a biomechanical opinion—which as an orthopedic surgeon he was unqualified to provide—not a medical opinion. Ms. Kochalka argues the doctor was doing nothing more than engaging in a differential diagnosis analysis and identifying—or in this case eliminating—a potential cause of the injury. We agree with Ms. Kochalka's characterization of the doctor's testimony. Therefore, it was error for the trial court to exclude the doctor's opinion as improper biomechanical testimony.

### References to Insurance

During voir dire, Ms. Bourgeois' counsel asked the panel members about their prior involvement with accidents and lawsuits. When one potential juror stated that he had been in an auto accident, counsel discussed with him the fact that he hired an

attorney, made a claim, and ultimately obtained a settlement. He then asked about the liability insurance involved, stating:

> MR. MEHRING: Do you remember the name of the insurance in that?
>
> MS. BRIGHAM: It may have been GEICO.
>
> MR. MEHRING: GEICO. Thank you.

He then moved on to the next prospective juror who made an auto claim and did the same thing, stating:

> MR. MEHRING: Okay. Do you know who the carrier was, the insurance involved in your case?
>
> MS. REA: I'm pretty sure Nationwide.

At that point Ms. Kochalka's counsel objected and moved to strike the panel, stating at a sidebar conference: "Why are we asking who the carrier was? The carrier is not involved in this case. That's twice he's done it. That's trying to inject that there is insurance involved in this case." The trial judge asked Ms. Borgeois' counsel why he was asking that question, and he responded: "I was just trying to see if it was the same as the carrier in this one." The judge sustained the objection and instructed counsel to stop referencing insurance but denied the motion to strike the panel.

During the evidentiary portion of the case, Ms. Bourgeois described the accident, and then referenced the fact that Ms. Kochalka did have insurance, stating:

> She asked if we were okay. You know, she just wanted to— she apologized. She did apologize, and then we exchanged insurance information. We had called the police station, but because it was in a parking lot they don't come to that scene. So after exchanging information we all left.

Ms. Kochalka once again objected and moved for a mistrial, stating: "I would have thought that Plaintiff would have been cautioned not to say we exchanged insurance information . . . . I've got to move—I've got to move for a mistrial, Judge." The judge reserved ruling at that time but ultimately denied relief on that issue posttrial. For the purposes of remand, we remind the parties and the trial court that in a negligence case the potential existence or amount of a defendant's insurance coverage has no bearing on the issues and should not be revealed to the jury. See, e.g., Beta Eta House Corp. of Tallahassee v. Gregory, 237 So. 2d 163, 165 (Fla. 1970) ("The existence or amount of insurance coverage has no bearing on the issues of liability and damages, and such evidence should not be considered by the jury."). The injection of any insurance issues into the case, whether deliberate or inadvertent, is improper and creates grounds for a mistrial.

> Under any court system it is difficult to attain a true and just result even under the most favorable conditions because of the frailty of man and his subjectivity to various prejudices and other influences that may warp his judgment in attempting to attain the ultimate truth in a given factual situation. The injection by either party to a cause, whether deliberate or inadvertent, of any such improper influence in a jury trial is a distinct disservice to the administration of justices, and lawyers, as officers of the courts, and the courts, on their own motion if need be, must be ever vigilant to see that no such influence creeps into the proceedings in even the slightest degree and subverts the noble purpose of our court system to provide 'justice under law.'

Pensacola Transit Co. v. Denton, 119 So. 2d 296, 298 (Fla. 1st DCA 1960).

Reversed and remanded for further proceedings.


SILBERMAN and BLACK, JJ., Concur.

- 11 -